The Honorable Justice of the United States Court of Appeals for the Foreign Sergeant. OBA, OBA, OBA, all persons from the United States Department of Business and the Honorable United States Court of Appeals for the Foreign Sergeant are admonished to draw the line at your attention. The court is now sitting. The United States can now be seated. All right, good morning everybody. Please be seated. Welcome to the court session for the United States Court of Appeals for the Foreign Sergeant. We are very pleased to be here at the Whitmore School of Law this morning to be client advocate for extending the invitation to the court. We have three cases on the calendar this morning. First case is 21-7239, Jones v. Solomon. Mr. Graeber. Chief Judge Diaz, may it please the court. Harry Graeber v. Jordan Jones would like to reserve four minutes of her time. The issue before the panel today is not whether Jordan Jones' constitutional claims are destined to succeed. The issue is whether those claims are substantive enough to warrant light of trial. And the answer to that question is plainly yes. Taken in the light most favorable to Jones, the record evidence in this case shows that two main things happened here. The first is that the defendants retaliated against Jones for filing grievances, sending him to one of the state's worst facilities as a result of his speaking out. We know that from their own words, and we know that from their own actions. The second. Mr. Graeber, can I ask you about that assertion that they transferred him to one of the state's worst facilities? I know that point was made, but what's the record evidence that supports that? So I think there's two buckets of evidence that support it. First is in the record. Jordan puts in his affidavit, which is not contradicted by anyone, that it had a wide reputation of being one of the worst facilities in the state. That's in JA80. Then if you go to JA150, document of grievance, they file on this for. He reaffirms how dangerous Lanesboro is, references a media account to that. That also points to all the available information to the court and the public record. What Jordan is saying is confirmed by everything that we know to be true. It's confirmed by media accounts. It's confirmed by cases within this circuit. It's confirmed by the fact that the state needed to shutter the prison because of how dangerous and corrupt it was. I think that the state's point on this score, at least for the summary judgment posture, is somewhat moving. It's a very, very formalistic argument. The state's not actually saying that Lanesboro was on the same footing as Avery Mitchell. What the state is saying instead is that Jordan did not put in enough conclusive evidence to show something we all know to be true. I think for a summary judgment posture, we look at available information to the court, plus what's in the record. If they claimed inference that Lanesboro was more dangerous, then at minimum, it's a disputed fact. The last thing I just want to say on this score is I would point this score to Judge Smith's opinion in Morris for the fifth circuit. There, the only evidence that I understood from the opinion as to why the facility was more dangerous was that it was common knowledge according to the inmate. And that assertion, uncontradicted by anything else in the record, was sufficient to establish an adverse action. Now, just the dangerousness of the facility is enough to establish an adverse action? I don't think the state can disagree with that proposition. Well, I think sending somebody from one prison to a marketally more dangerous prison is something that can deter some ordinary firmness from speaking out. I think that's a common-sense intuition that's confirmed reading case after case after case, courts confirming that. So I think that so long as it's greater than de minimis, I think sending to a place that frightens you, that a place that's more dangerous, a place where your health, your safety is at risk, is the sort of thing that might deter someone from speaking out. But it's also not the only adverse action in this case. We also bring up the fact that he was stripped of an educational program. And this is another point, too, where I think there's common ground between us and the state. I don't take them to dispute that stripping an educational program, stripping a privilege that an inmate cares about is another thing that can deter someone from speaking freely. And everyone agrees, too, that Thornton was kicked out of his educational program as an automatic incidental result of his transfer. The only remaining point is a dispute of fact, a dispute of fact about whether he was able to re-enroll in the educational program when he returned. This is another instance, too, where I think every reasonable inference that's available to the court cuts in our favor. You know, Jordan filed grievances as soon as he got back from Lanesboro, explaining that he could not participate back in his computer science program. Does that have evidence that the infact was not deterred? Oh, in fact, he continued to file grievances. I don't think so. I mean, I think the subjective experience is relevant, but it's not the whole analysis. And it would be sort of an irony to say that someone who persists with their constitutional right to speak, that you're going to help against them if they weren't deterred in the first place. You know, the test is objective. It's about whether a person of ordinary firmness would be deterred. I think sending someone to a markedly dangerous facility as a result of their constitutionally protected speech is the sort of thing that would deter a reasonable person. So, too, stripping a privilege, like an educational class. I mean, these classes are lifelines, as Jordan was explaining. It is what allows him to re-enter into society as a productive member who cared deeply about this class. And for the state to then strip it from him as a result of him speaking is the sort of thing that would deter an ordinary firmness, you know, a person speaking out. I think that one other point I would make on this board is that, at least with respect to causation, causation, you know, the district court didn't dispute causation, and the state picks it up here. But I think that there's very good reason that the district court did not press this point, that the direct and circumstantial evidence is before this court. You know, at first point, you defended Taylor. Defending Taylor is a decision-maker here. When defendant Taylor has a meeting on October 13th with Jordan, and all the grievance is literally on her desk, defendant Taylor then presses Jordan on his account of events, tells him to ease up if he wants to stay at Avery Mitchell. And then when Jordan does not relent, the next day he sends a letter to the grievance board complaining about how long this process is taking. The date after that, he's then sent to Williamsburg. But Taylor's not alone. As we documented three from day one, Jordan's decision to pursue grievances were met with hostility and promises of transfer, again and again and again, and that matches the circumstantial evidence. Again, as I said before, this was a day after he filed a letter to the grievance board that he was sent to Williamsburg. So I think that the test is whether you acted personally in deprivation. Taylor's, I think, a clear defendant, and I don't think that everyone fits that role. I think Taylor's clearly in. There are certain places of closer calls that I think might be in. For the conditions of confinement, you're closer to a dozen with respect to retaliation, at least of what's being complained for. But, I mean, Taylor's the clearest defendant. You also have defendant Penland, who was aware of the grievances, was discussing the transfer decision. Now, Penland was out on vacation when the actual transfer happened. I'm not sure that's sufficient to escape liability if you participated in the decision-making process itself. The result is that I think Taylor's clearly in. Then you have folks like Penland and Woffrin, who I think are closer to the margin, and I think that kind of fine parsing that I would suggest is something for a group of defendants. Did you abandon the Eighth Amendment claim? No, I'm happy to turn to the Eighth Amendment claim. But that's just pausing on a wider network of defendants. But I'm telling you, from the nature of your argument, you stopped the retaliatory aspect of the First Amendment. You believe that that's the stronger of the two that you would pursue this. So I think they're both winners, candidly. But I think the reason we left the First Amendment claim is here you have direct evidence that I think is quite technical. You know, Eighth Amendment claims are difficult by design. Sometimes they have, you know, certain precedent. I don't think that's true in our case. But with the First Amendment, you have evidence of the risk of harm. So I think the risk of harm, you can look at two sorts of evidence. One is the fact it's a squirt. And look two times again, it's when you have a clear prison policy on point with respect to something. So here your policy is on point with respect to hygiene and close observation procedures, both of which, as even defendants concede, were clearly violated. The other part, too, is that at some point, too, you know, Judge, when you brought this point up, Fowler, when you ignore obvious risks, when you ignore obvious risks, that's a serious, that's indicative of deliberate indifference towards a substantial risk of harm. I think when you force someone to engage with feces for over a day without an adequate means to clean themselves, I mean, Doran brought this up in his claim, cites the CDC, cites the OSHA, cites just common sense intuitions, that when you're forced to engage with it with bare hands, when you're forced to eat a meal without ability to clean yourself, when you're forced to stay the night in a spoiled state, that is a substantial risk of harm. That's common sense, and I don't think we have to blind ourselves to that there. So you're saying you don't need an expert testimony in this case? I don't, not for something like this, I think. Do you think you're fighting a great sense of love for her or not? I think, you know, it might look like it's pacing, but I think I'm trying to make common sense. I think, you know, what we point to in the briefs are decades and decades and decades of federal appellate courts making the common sense observation that when you force someone to engage with feces and don't give them ability to clean themselves, that presents a health risk. I don't think me, you know, I don't think Proce and Macy are experts for that. You know, maybe there are cases where that exists. I don't think that exists here. Are you looking for compensatory damages or penalty damages? We're looking for all sorts, all types of damages. But he didn't complain, he asked for compensatory, non-competitive, non-within-the-request-for-other relief. The whole thing lasted 17 hours? So I think that what happened was he slept through the night. So it was 29 hours without cleaning supplies. He said, you know, 29 hours. And that's what the district court agreed with, too. 29 hours without cleaning supplies, 17 hours without access to water. But I think the key point is that if you look at sort of the federal consensus that's emerged with respect to the 8th Amendment, there's sort of two touchstones that may have developed here. One is that when you deprive someone of basic hygienic needs, such that their health is put at risk, that is something where the 8th Amendment lines cross. And I think that what happened here says that. Because, admit, this is gross and dehumanizing. But when you look at the highly oppressive 8th Amendment violation, how does that satisfy the objective of the first clause? So I think that, you know, the 8th Circuit, I think, put this well in fruit, which was from 1990. If you look at that case, they already had, you know, a half a page worth of cites. You can't go decades back. Because the federal courts have been especially imparted or especially cautious about condoning conditions that include inmates' proximity to human waste. That's good. Perhaps you're honest, but what did we say? Did you say anything on this? So I think the court has brought this point up in McRae. It's brought this point up in Natalie. You know, what I would quote is that from, I think, Chief Judge Eagles put this point well in Elmore, looking at this court's cases and looking at what's the consensus of federal law. I would note just before that is that in Booker, in Booker, when doing a fairly established law analysis, what this court looked to is both consensus of federal courts, common sense, and prison manuals. All of those cut here. Chief Judge Eagles brought this point up. And this is what she says. There's nothing new or unclear about the need to be able to wash one's hands after elimination and before heeding and the obligation of prison officials to ensure this need is met. That's a district court case. That's a district court case. I think it's, you know, quite clear. I thought you were going to ask me about it. That's what we thought by precedent. That's not precedent for us. Well, it's Chief Judge Eagles. It's not precedent. It's Chief Judge Eagles in analyzing this court's precedent and analyzing a consensus of federal court precedent. I mean, I'd also point to, so, but then what context did Chief Judge Eagles make that statement? What was the deprivation in that case? So that case also was a dry cell. I mean, it's kind of, it's, the exact facts there. You're there for four days. You get a cold, bare mattress. The person's in shirt and boxers. It was similar in this case in a number of respects in that you're in a dry cell. I think it was maybe worse in a little bit. Like, you're there for four days versus here, it was about a day and a half. But our case was markedly worse in other respects, too. And then you had to run up to your own feet and deal with that protective equipment. I think the basic point is that what Chief Judge Eagles understood is that this court's cases and federal appellate courts lay out principles, not just fact patterns with respect to the Eighth Amendment. And their basic principles are that under the Eighth Amendment, you have to, prison officials must provide basic sanitation. When you force an inmate to engage with human feces, you need to give him the ability to clean himself. It might not be health and dignity demands of the inmate. Well, you know, back to Judge Wood's point. I mean, at some point, I guess the point is that there may be situations that happen in a prison, which as you indicated, are offensive, perhaps gross. But then the question is whether each and every violation fall on these lines of masculine Eighth Amendment violation. At some point, there's got to be some line strong, and why not in this case? So I think that today, I think the touchstones are twofold. One is that when you put someone's health at risk, I think that's what crosses the line. And I think being forced to sleep through the night after what Jordan had to endure is where that line is crossed. And I think, too, is that there's an element of this which is basically dehumanizing. This is what the court recognizes. The court recognizes the dignity aspect of this, too. When you ask time and time again for the ability to clean yourself, when you have to prod through your own feces as two men stand behind you and force you to do so and give you no ability to clean yourself when you're sleeping through the night. It's your problem that I would say is not respected with the Eighth Amendment claim. Even if you can establish this as an objective problem, which I think would create reasonable problems because the mission is that they would follow the string of what they argue. That's not my case. But even if you can't do that, there's a second problem. It's an objective problem. It deals with it on an individual basis of the defense. And what it doesn't appear to do is whether you can make a defendant-by-defendant breakdown as to what they did because that violence exists, at least on the second problem. How do you get over that hurdle on the Eighth Amendment? So I think if you look to where this court did in Baltimore, where you wrote it in Baltimore, which is that you look to two basic things here with respect to delivered indifference. What you said there is that circumstantial evidence can clearly prove delivered indifference because officers cannot bury their heads in sand to escape liability. And what are the two best sources of circumstantial evidence? One is on-point prison policy, which all of the officers involved in these settles knew about. They were aware of the policy. They disregarded it. And that's weighty evidence of delivered indifference. And the other part, too, is that when risks are obvious and you look past them, that, too, is weighty evidence of delivered indifference. So maybe I'm confusing. Maybe it's me. You straightened me out. It seems to me you're sliding back to the objective problem. You're dealing with policy and general conditions. The second problem deals with the subjective analysis of the defendant's own knowledge as to the actions of that incident. But what I'm saying is there does not seem to be a breakdown of defendant-by-defendant conduct here. So I think that focusing purely on the subjective problem, what you need is awareness and disregard. You need a culpable state of mind. I think all of the officers who were involved in this instance, Cooper, Lewis, Carpenter, Buchanan, Lowry, all of them were aware of the prison policy. All of them saw conditions that presented an obvious risk to health. So in both those instances, that all relates to their subjective mindset. When you know a policy is on the books, you decide to, in the state's own words, clearly violate that policy. That's weighty evidence of your subjective intent. When you see a prisoner have to engage with feces and not give him any materials, that's an obvious risk as your subjective intent. With Buchanan and Lowry, they were standing over him as he did it. They saw this. They saw his hands going full. They saw a pretty gross episode of things. This is common sense, and that's something that goes through subjective intent when they blow past obvious risks. I see that. Thank you. Thank you, Mr. Craver. We've got some time left for a while. Okay. Mr. Rodriguez? Judge, may I please report? Orlando Rodriguez from the Carolina Department of Justice. On behalf of the defendants in this matter, this court should affirm the summary judgment order from the lower court on both claims for several reasons. As to the transfer claim, this court should affirm the lower court's order because the transfer claim is not supported, the record does not support two key elements, essential elements of the transfer claim. The record doesn't support the adverse action element nor does it support the call for connection element. Additionally, under the same decision tests, even if this court were to conclude that the record evidence supported all the necessary elements of the retaliatory transfer claim, this court should nonetheless affirm the summary judgment order below. Moving to the condition of confinement claim, this court should affirm the summary judgment order of the lower court on that claim for multiple reasons as well. First and foremost, video evidence, which is quite compelling, and it's much better than circumstantial evidence. It's direct evidence of what happened in that cell on that day. It is clear that there is no objectively sufficiently serious risk of harm presented to Mr. Jones in that drug cell. You can see clearly what occurs on that day. He's given tonic pressures. He pokes around in his feces for a total of 23 seconds. He's then provided toilet paper, which he does, and he did it two of all three times that he had allowed in the cell. So the contentions that counsel just made about not being able to clean yourself for 29 hours overlooks the undisputed fact that he was provided toilet paper after that. Him, exactly, was the third time. Correct, Your Honor. It was the third time, and then approximately nine hours after that, running water in the resort of the cell. But your colleague on the other side says that with respect to the video evidence, that the district court made the mistake of sort of inferring evidence that really could be visible. For example, he doesn't allege that his client's hands were smeared with feces, but what he says is that without adequate cleaning supplies, soap and running water, and a lot even with toilet paper, that there still would have been a likelihood of serious harm because there would have been, perhaps, specks of feces and bacteria on his hands, which would not have been visible in the video. So do you disagree with that? I slightly, Your Honor, and that's because the plaintiff does indeed allege, quote, on J-82-15, paragraph 98, that he was, quote, required to be situated in his cell with urine and feces on his hands and arms. And elsewhere in the amendment, the complainant's allegations of the cell being covered in feces or having feces on it. None of that is the case. Okay, so you can repeat that, but can you repeat the point that even if feces and bacteria wasn't visible in the video, it still might exist on his hands?  I believe that that goes to the point that, quote, sometimes gross things happen in prisons. This was a disgusting episode that was a clear violation of policy. However, disgusting episodes and clear violations of policy do not automatically arise as a constitutional violation, particularly of the eighth amendment, which is indeed a high bar. Whether it's by design, as Mr. Graber mentioned, or simply by the nature of the Constitution itself, the cruel or unusual punishment violation is a high bar. And here the evidence does not meet that. They have to establish an objectively sufficiently serious risk of harm. The reason they can't meet that on this record is demonstrated by the series of cases that they cite. Matterly, disdain, all those cases are particularly grotesque, extreme, and outrageous. That's why they're eighth amendment violations. And that's why this is not an eighth amendment violation. Yeah, but I don't think those cases were intended to exclude each and every possible scenario, right? They were not, Your Honor. But they are a lesson. No, no, no. That's the point, right? They're a lesson, but they don't stand alone. They're not intended to be the complete universe of possible cases that are not eighth amendment violations. Absolutely. So why not this one? Why not this one? Because we have to draw a line somewhere. And if you asked, Your Honor, to mention we have to draw a line somewhere, and drawing a line here in this instance would effectively make any time a prisoner is unable to wash their hands after they've defecated a constitutional violation, that would be a first aid violation that would open literally the full case to a prisoner of litigation complaining that there wasn't water in that particular sink. There wasn't running water. And there hadn't been soap there. So automatically, we've got to check the problem of the objective problem. That doesn't even account for the subject of the problem. Your Honor has asked questions about it. We have, I think, 16 defendants.  of being involved in the inspection of the feces, which set the heart of the condition of the confinement. The only policy violation, which Mr. Graber mentioned repeatedly, but failed to pinpoint, was that either Mr. Jones was forced to or allowed to inspect the feces, regardless of whether he was forced or allowed to inspect the feces. It's a policy violation. It should not have occurred. But that policy violation was undertaken by only two defendants, Lowry and Buchanan. None of the other defendants are implicated in that policy violation. There is no record evidence whatsoever asking any of the other defendants and their subjective knowledge of any risk of harm to Mr. Jones. And there is no record evidence that the defendants, Lowry and Buchanan, were ones that were involved in the inspection of the feces, had subjective knowledge of risk of harm. That's clear from, or that's in part supported by the notion that, yes, there was a policy violation. There's no evidence that there was no policy violation. There's also no evidence that Mr. Jones made a request to many of these defendants for additional cleaning supplies. The reason why that's important is that such evidence, a verbal request for additional cleaning supplies that was rejected, couldn't supply some sort of subjective knowledge to the defendant that hears that request. We don't have any evidence of that. What we have are Mr. Jones' statements in his affidavit that aren't statements that he requested and was denied materials. It's that he wasn't provided, in general, supplies to clean himself. But that overlooks the fact that he wasn't being provided materials to clean himself with toilet paper after his bowel movement. And it doesn't refute the evidence that there were materials present outside that Mr. Jones did not request. So on this subjective problem, you know, you get there. And the issue is, is there a defendant-by-defendant breakdown? And you sort of articulated your point well. But the point, the point that seems to me, is that, you know, there's this thing called common sense. Don't you have a consensus of people who are in authority? In my case, it does to some extent. And an individual who is in prison, who is not permitted to wash his hands and to defecate for the purpose of determining that he's a conspirator in this species. And this goes on. And we've all pretty well understood that that's a negative thing. That can lead to very negative things. You say gross dehumanizing. I mean, the precedent doesn't quite take us there. But at least on an individual basis, do we really need to articulate that under circumstances here where it seems very clear that the actions in and of themselves constitute actions that could be considered cruel to them, human, or at least abusive, based on their purposes? Well, Your Honor, I believe that you can and you should in a case-by-case basis, which is why Chief Justice Eagle, or excuse me, Chief Judge Eagles, in the middle, she didn't think there would be a demotion if you called her a chief. She didn't define a scenario that involved the inability to wash one's hands over the course of four days was a violation of the Eighth Amendment. And that is a perfectly reasonable, I presume, conclusion based on that record. This record, however, does not support that. I do believe that we need to stay clear of setting sort of per se rules for any time there's an inability to wash one's hands after defecating, you've got an Eighth Amendment violation. That is not the way the Eighth Amendment cases are dealt with at the district court. They're dealt with on the fact-intensive investigation, which is what Judge Rutter did here. And what Judge Rutter did was value the evidence, credit the evidence, in favor of Mr. Jones. Sometimes he did, and sometimes he seemed to credit the government's evidence where there was material that spewed a fact. That points back to the video evidence where he suggested, based on the recording of the video, that there was no evidence of PCC or other bacteria on the defendant's, on the prisoner's hands. And that clearly is not. That's clearly an inference made against the petitioner where it's under judgement. Yes, Your Honor. I understand that interpretation of Judge Rutter's interpretation of the video. And I think that my point there would be that Judge Rutter, I believe, was responding to the specific assertion that his hands were being armed for covering the feces and that he was forced to sleep in a soiled state. And while the video does not depict, cannot depict whether there was particular matter or bacteria on one's hands, it does not prove, and could depict, feces, visible feces, matter on one's hands. So I think Judge Rutter was really referring to how that direct video evidence actually refutes one of the plaintiff's assertions. He may have taken extra liberties, perhaps, with additional interpretations of what that video evidence depicts. But I think the totality of the record, it's still self-concluding. Can I ask you to get to the topic, get to the retaliation? Yes, Your Honor. Because I think there's some issues there, I think, for you. Yes, Your Honor. Well, so on retaliation, I think here I would just remind the court that we've got three elements. The protective conduct, which is undisputed. Submitted grievances. Presumed that this court's precedent is a protective activity. We concede that. Second element is an adverse action. Third element is a causal connection. Here, the record evidence is insufficient to support the adverse action. And that is for multiple reasons. One, there is no evidence of loss of any privileges. There is no evidence of a demotion to custody. There is no evidence of a material change in the evidence that this precedent was being sent to a good person. Your Honor, thank you for directing me to that. Because I was going to get to, after I went down the list of what there is and what it is. Yes. Well, so I want to talk about what Mr. Jones's contentions are to support the adverse action element. And one of the principal contentions is this notion that Lansborough is indeed more dangerous. That is based on a single sentence at J.A. April, his affidavit, where he says, now that everybody knows Lansborough is more dangerous, it's widely known that it has a worse reputation in every dimension. That everybody knows that Lansborough is more dangerous is a far cry from evidence that Lansborough is indeed more dangerous, which is what the jury would have to find in order to find a good demotion. And to do that, based on that single statement, the jury would have to speculate and stack inferences. And that's why it's insufficient to overcome summary judgment. Even if you tack on the news reports, which I would mention a few things about. One, they're not part of this record because they were not presented to the Overworld Oath. Two, those news reports were dated years after, multiple years after Mr. Jones was housed at Lansborough. Three, when you read those news reports, they don't actually say Lansborough is more dangerous than this prison for these reasons. Lansborough is more dangerous than these other prisons for these reasons. They're general news stories about the change of the Department of Public Safety administered to that prison for a variety of reasons. Some of which, yes, included violence that this court has acknowledged in other cases. But in those other cases that the court has acknowledged that there was violence at Lansborough, there was a distinction about specific instances of violence. I mean, there's clear evidence in this record, and correct me if I'm wrong, but the petitioner or the inmate says there were a number of prison officials who told him, if you continue to file grievances, it's going to be hard for you to stay where you are right now at the present facility, suggesting that he would be transferred as punishment for continuing to file grievances, irrespective of whether there's a ton of evidence as to whether or not the prison that was at Lansborough to where he was transferred was, in fact, dangerous. Isn't that evidence in and of itself sufficient to show an attempt to punish here? He also, as I understand it, he was asked whether or not he wanted to be transferred. He said he didn't want to be transferred, yet he was sent away. So why couldn't the jury find that evidence and the evidence about the loss of programming that resulted in why that would be an opportunity to find retaliation? Yes, Your Honor. Well, if I can break that, but Your Honor, we've got a couple of issues going on there. With respect to the various statements, I think that goes to the causation element of the retaliation plan. And there's some issues with that, primarily that Mr. Jones lists a number of- The way the judge just phrased it, he didn't just leave that for causation. He poured it right into the dangerous aspect of adverse action on him. And we can actually address it that way as well, Your Honor. That's the way it's being proposed. So we can assume that the adverse action element is implied. Then we turn to the causation piece, because we can either assume that the adverse element is implied because of the statements that are made, and that the statements- What I'm saying is so it gets muddled there is you were speaking to the adverse action on the causality of it. And given, yes, the fact that the city would be transferring goes to the causality of it. But if you say it in a punitive way, as you say, we'll send you somewhere worse if you read this document. In other words, there's something negative about transferring you. That's the adverse action. It may not rise to the limit of the dangerousness we were talking about previously, the evidence there, but the fact that statement alone, as I listened to the Chief's question, was that if you're going to send me somewhere, I will send you somewhere else. We've had this many times before. We'll do something to you if you don't do this. And we'll continue to do this. And that's the aspect that was speaking up there. Yes, and I now understand the Chief's question in wrapping up and applying both issues. And I think my response is similar, whether we're talking about both of the elements or one of the other elements. It sounds like a threat that was carried out. Right. And if we assume that that was what the evidence is, the issue that Mr. Jones still has, Your Honors, is that those statements, most of those statements were uttered by people that are either not parties to this litigation or are not one of the four defendants that is a target defendant for this claim. And because of that, they are not personally involved in the actual decision to transfer Mr. Jones, which has to be necessary. That has to be present for them to be liable for a 1983 violation. So in order for a jury to assume or to conclude that what Your Honors are implying by the questions, that there was this threat that was communicated to Mr. Jones as evidenced by these various statements and carried out by Defendant Taylor as evidenced by these various statements, well, the fact that those various statements didn't come from him and didn't come from the other three defendants that are targets of this retaliation claim means that a jury would have to speculate in seconds. Now, is it really speculation that you've got these prison officials, even if they weren't, the ones who ultimately made the decision suggesting to the prisoner that, hey, if you don't get in a lot, this is what's going to happen. And eventually that very thing happens. Why would it be speculation for a jury to conclude that, yeah, they all got together and this is what they did? Because of that last piece, Your Honor, that there is no actual evidence, circumstantial or otherwise, that all of these speakers got together and were on the same page about what was happening. What we have instead is a land uniform drawn, and they said this is what happened, and it happened. Right. And, Your Honors, even if we assume that the adverse action element is present and that the causation element is present and that the provocation case of retaliation claim is satisfied, the defendant or the defendants here are still entitled to summary judgment under the same decision test. Under what? The same decision test, Your Honor. Under the same decision test announced by the circuit, if the provocation case is established, the burden shifts to the defendants to establish that there was a legitimate reason that's unrelated to or separate from the predicted conduct to support the decision that was made or the outcome that was arrived at. In this case, the record evidence shows that Mr. Jones was transferred because of behavioral issues, and that is an independent reason that's not tied into the grievance. So even if this court were to conclude that the record could support the necessary elements of a retaliation claim They can look at it in the language of federal law they have, but conclude it was transferred because of bad behavior. Correct. But if that's your view, if that's your provocation, that's your disbouncing. Yes, and so if that's the conclusion that the court arrives at, if there's an issue, then the burden shifts under the same decision test. So what point do you give to qualified immunity? Assuming all these things occurred and all this tied in and he was transferred because of his grievances, will there be qualified immunity here? Do you claim that view? I am, Your Honor, and I'm claiming that at almost exactly what I was intending. That's right. That's where the end of my argument. Even assuming that the elements here are satisfied, arguably, by the record evidence, it cannot be said that as of April 2015, that a reasonable correctional officer in the defendant's shoes, under these circumstances, would have known that transferring Mr. Jones from Indian Provincial to Lanesboro would be a violation of his first amendment rights. Similarly, it can't be said that the defendants in this case should have known, based on clearly established law, that forcing or allowing Mr. Jones to inspect his feces for 23 seconds and otherwise allowing him to rise on the procedure, which is not being challenged here, was a violation of his interest. Your Honor, we reached that right, so why should we decide that if we were to rule against you on all the other issues that have to do with qualified immunity, why wouldn't we send it back for that analysis to be done in the first place? Well, Your Honor, so this is an overview from a summary judgment order, which I think resets the table and allows the parties to present their arguments. That argument was presented in a briefing. Your argument, I think, supplies a sufficient basis for this court to rule in favor. Well, we don't normally do that kind of thing. We read these things. We were going to read it instead of first read it. Yes, Your Honor, but on a summary judgment order, a few of the summary judgments have been over-reviewed, and so we believe that we could. Right here, we could, but we don't have the abilities. Chief just told you. We've got enough work to do. But, Chief, the argument is not clearly established. Oh, yes, isn't it that, therefore, qualified immunity applies? Yes, Your Honor. Our contention is that qualified immunity applies here because in 2015, it was not clearly established that a transgender individual was in retaliation or that allowing an infected species in his cell was an anti-humanity violation. Didn't we hold in Martin that to be free from retaliation by prison officials was, in fact, clearly established? Didn't we hold that back in 2010? Yes, you did, Your Honor. Which is why we conceded the first problem of the retaliation claim, that is, it's a protected activity. However, we defended the other two elements of the claim. Qualified immunity is what I'm going for. Right. You claim that qualified immunity should exist here because this wasn't clearly established. Is that what you said or not? Yes, Your Honor. What I just said, Martin said it is clearly established. I read Martin to me that it's clearly established that that's a protected conduct, not that transferring someone without being able to… In 1983, that is one of the problems, whether there is a constitutional violation. And if, in fact, there was a violation, was it clearly established? And I understood it that you were hanging your head on the clearly established problem. And the clearly established problem being predicated on the fact of filing or being retaliated for filing a grievance is a protected right. Martin said it is. Right. Well, that's because what's not clearly established is the adverse action and the causal connection of it. It's not necessarily the first problem, which is… I think that's a clue. I'm not sure 1983 goes to that level of specificity on that. It would have been only with the general clearly established right here that there was such a 1983 claim. It was one of the records that was filed by the guilty. But the clearly established problem has been litigated to death. When you come down to it, who comes to it? Is it a law in this circuit or in the Supreme Court? Maybe one day the Supreme Court will make justice to the Supreme Court. I don't know what we've got to do. But at least in this circuit, there is that law. The point of this is that that's a clearly established right. Well, Your Honor, I apologize for – perhaps Mr. Martin, my reading of it was that it was a clearly established right. I tried to write too much on this. I questioned you. Yeah, so I read it as it's a clearly established right that you can't retaliate for submitting grievances. What I did not read it to say was that it was a clearly established right that you can't transfer someone after a grievance. Is therefore any transfer that occurs after a grievance is – Well, you're sort of getting to what's the level of generality or specificity that we need to establish a right at. And I guess just one point is that it clearly is established that you can't retaliate against someone by filing a grievance. You're saying the nature of retaliation is relevant as to whether or not an officer is entitled to qualify for the hearing. The nature of retaliation, I would also extend that to say the basis for the transfer, which gets back to the same decision test. Here, this wasn't a – it wasn't a – everybody's agreeing we transferred because of the grievances. There's a disputed fact that there's a dispute about that. But then even if we assume that that is accurate, there's also this legitimate basis for a transfer. And I think that that's what makes it different, perhaps in other cases, where the prison system may admit we transferred you because of the grievances, but we didn't know that that was clearly established. In that scenario, I do not believe that you can claim a qualified opinion. A judgment would be absolutely correct there. In this scenario, I believe it's a little bit different. All right. Thank you, Mr. Berger. Thank you for the excellent time. So may I please report a few points on the First Amendment piece and then turn it to the aid? First, on the same decision test, I don't think the same decision test works here for the same reasons it didn't work in Part 1 and 2. In large part because the state has never been able to get the story straight about why they made the decision at issue. At first, you look at J.A. 187. They said it was security issues with staff. Then when Jones was transferred back, litigation started coming on the horizon. It evolved into sexual activities with inmates. When the state offers shifting reasons for its decision, it can't then go to the same decision test on a summary judgment posture, especially, as we explained in the brief, when each of those stories, wherever you pick, are independently contradicted by the record. It makes no sense that there are security issues to transfer back in 12 days, and the only time there's record evidence about sexual activities, Jones is telling me it denies that it's a J.A. 163. On the point about this being more dangerous, it bears emphasis that this is a fundamental dispute of fact. The state's principle line of defense with respect to First Amendment litigation is a dispute of fact about the relevance of the J.A. It doesn't have to say the record of dangerousness. I heard the opponent say they have to put a point sentence. You have to put one sentence in the affidavit. It's repeated in the grievance that we noted, J.A. 159, and then what we rely on is the materials that are available to this court. I just want to point this to the idea that us going to have a part-time group in the Central Health. The case that we cite in the footnote, in the reply brief about the conditions of Lanesboro, they're quoting declarations from people that work at Lanesboro. Everyone knows that Lanesboro is a markedly worse facility. The state's own argument is flagging. Supply is flagging. The pros say it's flagging. Everyone knows that they need to take judicial notice of it. Some here want to know. But, I mean, that's the open way of saying it. Everyone knows that. I'm not sure that's evidence. I think just the point is that when every single condition before the court confirms something that we all know to be true, by summary judgment and posture, you cannot draw that factual line making favor of the state. At no point, at no point did they even attempt to explain that Lanesboro is on the same footing as Avery Mitchell because they can't. So the issue is just how much does the pro se person need to put forward to prove something we all know to be true. Even if we had some questions about that, do you need that in order to prove it? Well, I think that, I mean, not necessarily. I mean, you know, the perception of Lanesboro as being more dangerous, again, threats count here, too. So threatening a prisoner, sending them to a place that is more dangerous is something that can deter his speech, can deter the prison speech. We also have the vocational program. In the state sentence brief, this is the automatic and incidental result of a transfer. Is the threat something we have to infer from the statement or is it a direct threat? It's pretty direct to me. Unless you ease up on your grievances, you're going to have a hard time standing here. I don't know how you see that as anything but a threat. Certainly the light was favorable to us. I think you can understand it as a threat. And, again, Taylor's not alone here. You know, from the first moment that Jones was filing out grievances, you have people standing over his shoulders. Again, it looks like there's a lawyer, all this stuff. Again and again and again, people say you're going to get transferred. I think sooner or later it starts looking a lot like a threat. Just on, you know, qualified immunity, there's one point, too. Judgment, I think you put the subject to bed in Barnett and the court confirmed it in Booker. The anti-retaliation rule is a clear rule that provides fair notice. Neither in Barnett nor in Booker did this court slice the baloney any thinner than that. It did not go means by means by means of retaliation. The anti-retaliation rule that you can't go after a prisoner for filing grievances is clearly established law in the circuit. It has been since at least 2010. What I would note, too, is that the state's argument here is they don't really kind of pick this up as a qualified immunity analysis on proper terms. What they say is that, well, in our account, we didn't violate the law in the first place. We didn't violate clearly established law. It doesn't work, that kind of circular argument. It doesn't work on summary judgment posture when the facts are supposed to be taken in our favor. Save that amount of time. Thank you, Mr. Brigger. I note that, Mr. Brigger, you were court-appointed. I want to thank you on behalf of the court for taking on this assignment. We obviously could not do the work that we do without lawyers who are willing to take on cases. Prosecutors like this are able to argue the case, as you did here today, and Ms. Brigger, as you were able to represent the interests of the state as well. So thank you both for your arguments. We typically come down from the bench and bring counsel. I was trying to figure out how best to do that without having to climb over the bench. I know the judge wouldn't just keep it through that. I'm not sure that I could. He's like, we know that. OK, great. We'll come down and you can reach it. Good.
judges: Albert Diaz, Robert B. King, James Andrew Wynn